## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| DANIEL CARCILLO; and NICHOLAS BOYNTON, | |
| Plaintiffs, | Case No. |
| | Jury Trial Demanded |
| v. | |
| NATIONAL HOCKEY LEAGUE and NATIONAL HOCKEY LEAGUE BOARD OF GOVERNORS, (collectively, "NHL"), | **COMPLAINT** |
| Defendants. | |

Plaintiffs, DANIEL CARCILLO and NICK BOYNTON, by and through their attorneys, MESSERLI | KRAMER, CORBOY & DEMETRIO, P.C., and GORDON LAW OFFICES, LTD., complaining of defendant, NHL, state:

### BACKGROUND

1.      Defendant, NATIONAL HOCKEY LEAGUE ("NHL"), operates a professional ice hockey league, consisting of thirty-one (31) franchised member clubs.

2.      The NHL is governed by the NHL BOARD OF GOVERNORS which establishes the policies of the League.

3.      The Defendants, unilaterally, determine the policies of NHL hockey and the environment in which the game is played; the NHL is the steward of the game of professional hockey in the United States and Canada and controls how the game is played and, if, and when, players are provided warnings of injury risk(s).

1659169.1

4.     The NHL's self-imposed, assumed obligation and responsibility is to make the game safe for its players.  This obligation is not guided by, nor based upon, collective bargaining.

5.     To keep its players safe, the NHL, throughout its history (long before it engaged in collective bargaining), has implemented changes to its playing rules.

6.     In addition, the NHL has gratuitously engaged in the study of certain player safety issues in furtherance of its purported commitment to keep its players safe during, and after, its players' careers. These studies, throughout the years, have been endeavored to inform the enactment of appropriate interventional strategies in order to reduce the risks of injury in NHL hockey. These interventional strategies include warning players of certain inherent risks.

7.     One of the areas of player safety that the NHL gratuitously committed to study is the issue of repetitive head trauma sustained by NHL players.

8.     After years of supposed study, the NHL still refuses to acknowledge that repetitive head trauma in the NHL can cause or contribute to cause neurodegenerative conditions, such as Chronic Traumatic Encephalopathy ("CTE").

## THE PARTIES

9.     DANIEL CARCILLO is a United States Citizen and a resident of Illinois.

10.     CARCILLO played a total of four hundred and twenty-nine (429) games in the NHL for the Phoenix Coyotes, Philadelphia Flyers, Los Angeles Kings, New York Rangers, and Chicago Blackhawks.

11.    In addition to regular season games, CARCILLO also participated in hundreds of NHL pre-season games, training camp practices, pre-season regular- and post-season practices, and morning skates.

12.    During his NHL career, CARCILLO was involved in a total of one hundred and forty-nine (149) hockey fights.

13.    CARCILLO suffered multiple serious head traumas during his NHL career that were not recognized, diagnosed or treated, and improperly diagnosed and treated.

14.    NICHOLAS BOYNTON is a United States Citizen and a resident of Arizona.

15.    BOYNTON played a total of six hundred and five (605) games in the NHL for the Boston Bruins, Phoenix Coyotes, Florida Panthers, Anaheim Ducks, Chicago Blackhawks and Philadelphia Flyers.

16.    In addition to regular season games, BOYNTON also participated in hundreds of NHL pre-season games, training camp practices, pre-season regular- and post-season practices, and morning skates.

17.    During his NHL career, BOYNTON was involved in a total of fifty-one (51) hockey fights.

18.    BOYNTON suffered multiple serious head traumas during his NHL career that were not recognized, diagnosed or treated, and improperly diagnosed and treated.

19.    The NHL is an unincorporated association of professional hockey teams that operates out of many different cities and states within the United States and Canada,

including Chicago, Illinois. The NHL is headquartered at 1185 Avenue of the Americas, New York, New York 10036.

20.     Defendant NHL Board of Governors is the ruling body of the NHL. Each team appoints a Governor and two alternates to the Board of Governors. Among other responsibilities, the Board of Governors has the authority to establish the rules and policies, and playing rules, of the NHL.

21.     Defendants are subject to *in personam* jurisdiction of this Court, and venue is proper herein pursuant to 28 U.S.C. 1391, because Defendants conduct continuous and systematic business within the State of Minnesota.

## THE NHL'S PROMOTION OF VIOLENCE IN THE GAME OF HOCKEY

22.     The NHL's avaricious desire to permit and promote fighting in NHL games is reprehensible in light of its knowledge that "fighting raises the incidence of head injuries/concussions, which raises the incidence of depression onset, which raises the incidence of personal tragedies."[1]

23.     As one NHL executive explained, "the nature of problematic contact with the head evolved [in the NHL] over time... the League and General Managers, and in some instances, even the courts, had always addressed the problem with new rules and supplemental discipline. But, the NHL consistently failed to address the one element of its game that was inevitably unsafe for its players–fighting.

---

[1]     Document labeled NHL0155220 (De-Designated); Produced *In Re: National Hockey League Players' Concussion Injury Litigation*, MDL No. 14-2551.

24.     By permitting and promoting fighting, the NHL allowed young players to grow up through the ranks of hockey, learning not how to score goals or kill penalties, but how to fight. The emotional and physical toll exacted on these young men have led to terrible tragedies.

25.     The NHL refused to eliminate fisticuffs because "elimination of fisticuffs may be a disaster for the NHL and once removed will be impossible to reinstate without a media backlash."[2]

26.     The NHL, for decades, has refused to eliminate fighting from its games, practices or culture because of a fear of diminishing revenue.

27.     It is hypocritical and, in fact, negligent, for the NHL to express concern for player safety on the one hand, and permit and promote fighting on the other. In hypocritical fashion, the NHL states that it "will not tolerate blows to the head that are deliberate, avoidable and illegal,"[3] but permits and, in fact promotes, fighting in its games.

28.     Fighting causes a very dangerous combination of physical and emotional turmoil for NHL Enforcers/Fighters.

29.     The NHL also knew, or should have known, that fighting causes brain trauma. As has been stated by Dr. Robert Cantu, a renowned neuro-scientist, "The brain

---

[2]     Document labeled NHL0143212 (De-Designated); Produced *In Re: National Hockey League Players' Concussion Injury Litigation*, MDL No. 14-2551.

[3]     Document labeled NHL0031065 (De-Designated); Produced *In Re: National Hockey League Players' Concussion Injury Litigation*, MDL No. 14-2551.

doesn't know what causes it to be shaken – whether it's a helmet-to-helmet hit, a left hook or a check."

30. The NHL further knew, or should have known, that brain traumas sustained in fights can lead to permanent brain injury, including but not limited to, memory loss, dementia, depression, CTE, and related symptoms, including addiction.

31. Yet, while personal tragedies endured by professional hockey players continues to mount, the NHL still permits and promotes fighting.

32. Instead, for nearly a century, the NHL has developed and promoted a culture of gratuitous violence within NHL hockey.

33. Part of the NHL's strategy has been to promote brutality and violence by glorifying the violent aspects of the game, including but not limited to the vicious bare-knuckle fist-fights that occur on the ice.

34. Throughout its history, the NHL's wisdom in permitting and promoting violence in its game has been questioned. For example, in 1974, the Ontario Cabinet appointed Canadian lawyer, William McMurtry, to issue a report on violence in hockey. As part of his research, McMurtry interviewed numerous NHL players. His official report concluded:

> In talking to numerous players in the NHL...they all feel that most advertising and selling of the game is over-emphasizing the fighting and brawling at the expense of educating the crowds about the skill and finesse. This past season the advertising for the NBC Game of the Week showed a film clip of a hockey fight. Can you conceive of any other sport promoting itself in this fashion?

35.    In 1975, the players proposed the imposition of an automatic suspension for the balance of the game in which a fight occurred (and at least one more game). The NHL chose not to enact a rule change at that time. In rejecting the proposal, one team president's statement reflected the League's stance: "We believe in fighting. It's an exciting part of the sport."

36.    One of the NHL players advocating for a ban on fighting, Bobby Hull, staged a one-game strike in protest of the NHL's commoditization of violence, stating "[t]he game is no pleasure any more. It's an ordeal." Hull further stated:

> It's time we took some action...because, if something isn't done soon, it will ruin the game for all of us. I've never seen so much stuff like this. I never thought it could be so bad...It's becoming a disaster...The idiot owners, the incompetent coaches, the inept players are dragging the game into the mud. They're destroying it with their senseless violence.

37.    The NHL did not adhere to Hull's request. Instead, fighting increased over the following decade. The NHL has referred to the 1980s as The Golden Era of Fighting – during these dates, the League averaged approximately one fight for every game played.[4]

---

[4]    Document labeled NHL0230647 (De-Designated); Produced *In Re: National Hockey League Players' Concussion Injury Litigation*, MDL No. 14-2551.

38. In January 1985, at the Annual Meeting of the League's General Managers, the advantages and disadvantages of removing fighting from hockey were discussed.[5] Fighting was not removed from the game.

39. On February 17, 1986, Sports Illustrated published an article entitled, Hockey? Call It Sockey: Hockey's designated hit men are making a travesty of the game. It's high time to get rid of all the goons, where it firmly criticized the NHL's failure to take action against violence, stating:

> [M]any NHL executives are scared to death that if fighting were banned from hockey, thousands of season-ticket holders who get their jollies from watching grown men in short pants in a quasi-legal, bare-knuckle battle would bail out on the spot.

> Violence sells. That's not news, so does sex. If that's what's important, why doesn't the league hire a bunch of bikini clad bimbos to skate around behind the Zambonis holding up placards showing each team's penalty totals?

40. By 1992, many involved in the NHL began realizing that permitting fighting in its games was foolish and that it must do more to keep its players safe (i.e., "The NHL has made incremental changes vis-à-vis fisticuffs in the past and based on their success should continue to do so."[6])

41. Despite repeated criticisms from players and media, as well as its own realization that it must continue to move towards eliminating fighting from its game, the

---

[5] Document labeled NHL0211716 (De-Designated); Produced *In Re: National Hockey League Players' Concussion Injury Litigation*, MDL No. 14-2551.

[6] Document labeled NHL0015999-6001 (De-Designated); Produced *In Re: National Hockey League Players' Concussion Injury Litigation*, MDL No. 14-2551.

NHL refused to ban fighting and, in the 1990s and 2000s, its prevalence continued.

During these times the 'staged fight' was a nearly every night, every game, phenomenon:

> The golden age of the hockey enforcer was born, stretching through [Marty] McSorley and Bob Probert, Tie Domi, Georges Laraque, Rob Ray and Donal Brashear. They increasingly settled their teammates' scores by fighting each other. Imagine in American football, if a linebacker hit a quarterback with what the quarterback's team believed was too much force. Or if a baseball pitcher plunked a star batter with a ball, or a basketball player committed a hard foul on a top scorer. The equivalent to hockey's brand of justice would find those teams sending a specific player from their bench– someone hardly valued for his skill has a player, perhaps rarely used– and having them fight one another.

> Their bouts combined the brutality of boxing and the showmanship of professional wrestling. The men sometimes fought for no purpose other than to satisfy the expectation of fans, or for the chance to be relevant. Coaches used them to stem the opposing team's momentum or change the tenor of the game-maybe "send a message" for the next time teams played. If felt like a sideshow. But the punches were real.

> When enforcers fought, the game clock stopped. Other players, restricted by stricter rules barring entry into a fight[7], backed away and watched. Fans, invariably, stood and cheered, often more vociferously than when a goal was scored.

> Television cameras zoomed in, and a graphic providing each fighter's height and weight often appeared on the screen. Play-by-play men took on the role of boxing announcers, their hyper-charged voices rising and falling with every blow. Punches produced a reflexive chorus of ooooohs from

---

[7] Following the 1971-72 imposition of a game misconduct imposed on a player who intervenes on a fight already in progress, (the "third man in rule"), the growing trend over the previous three years of two players on one player fights was eliminated. Document labeled NHL0230701 (De-Designated); Produced *In Re: National Hockey League Players' Concussion Injury Litigation, MDL 14-2551.*

the crowd. The volume ratcheted with the sight of blood, flying equipment, and maybe a dislodged tooth. The fight ended only when one of the players fell to the ice or when the violence slowed, like the dwindling energy of popcorn when nearly every kernel has popped...

Fans gave standing ovations. Teammates banged their sticks on the boards in appreciation. Replays of the fight, usually in slow motion, filled the giant video screens in the arenas and the television screens at home. Fights were staples of the nightly sports highlight packages.[8]

42.    Instead of eliminating fighting, the NHL enhanced its visibility and promoted the fights in an effort to get more fans through the turnstiles.

43.    Armed with knowledge that fighting was physically dangerous and emotionally perilous, the NHL still promoted fights, by including, but not limited to:

(a)    Promoting the HBO documentary, Broad Street Bullies, on its Philadelphia Flyers affiliated website. The trailer for the film, viewable on www.flyers.nhl.com, features clip after clip of fighting and violent head shots, accompanied by voice-over testimonials extolling the virtues of winning through "intimidation" over talent;

(b)    Creating, through NHL Original Products– an agent and instrumentality of the NHL devoted to producing promotional films for the NHL–numerous features that focus on the hardest hits that take place on the ice, further advancing the NHL's culture of violence as entertainment;

(c)    Displaying on www.nhl.com its Enforcer/Fighters and fisticuffs in the main news story rotation on a nightly basis;

(d)    Producing on the NHL Network, a weekly program segment called "Top 10 Hits of the Week";

---

[8]    Branch, John. Boy On Ice: The Life and Death of Derek Boogaard. New York: W.W. Norton & Company, 2014. 61-63. Print.

(e)    Permitting individual teams to show in-game replays of violent hits, with the marquee "Hit of the Game" above the jumbo television screens;

(f)    Creating through NHL Films, an agent and instrumentality of the NHL devoted to producing promotional films, numerous highlight features that focus solely on the hardest hits that take place on the ice. These featured videos are marketed and sold to advance the NHL's culture of violence as entertainment; and

(g)    Licensing NHL-sponsored video games including fighting and vicious body checking. For example, the NHL licensed EA Sports to produce NHL 14, released on September 10, 2013, and which featured a completely revamped fighting system called the "Enforcer Engine." Those new features included: (a) Enforcers/Fighters coming to the aid of downed superstars and initiated fights; (b) "physics-based punch targeting" that make blows more realistic; and (c) real-time facial damage such that bruising and black eyes remain throughout the game.

44.    Permitting and promoting fighting has been simply a bottom-line issue for the NHL. Former NHL President John Ziegler explained this best in 1989 when discussing his reluctance to prohibit fighting:

> If you did that, you wouldn't be commissioner for long... The view of the 21 people who own the teams, and employ me, is that fighting is an acceptable outlet for the emotions that build up during play. Until they agree otherwise, it's here to stay...The main question about fighting is, "Does the consumer accept it?" The answer, at present, seems to be yes.

45.    The NHL's continued adherence to staged fights in its game was negligent and demonstrated a conscious disregard for the safety and welfare of its players.

46.    For almost a century, while unnecessary violence, including brutal fist-fighting, has permeated NHL games, the NHL has been on notice that multiple blows to the head can lead to long-term brain injury, including but not limited to memory loss,

dementia, depression, addiction and CTE and its related symptoms. Yet, the NHL said nothing to its players about any of it.

47.     Violence in hockey persists for one simple reason: Today, as in 1975, the men who control the game have no interest in eliminating it. Any reasonable analysis would conclude that players should not be policed by other players, that the threat of retaliation should not be used to enforce good behavior, that infractions of the rules should not be used to market a sport.

48.     But, for nearly a century, the NHL has sanctioned fighting in its product because it has continued to profit handsomely from its culture of violence, notwithstanding the brain injuries inflicted on NHL players. The NHL created, and refused to change, a culture in which the "toughest" players are glorified—and maintain job security—for their ability to dish out and endure severe violence on the ice.

## COUNT I
## CARCILLO V. NHL – LEAGUE INCREASED THE RISK OF BRAIN DAMAGE, ADDICTION AND DEPRESSION.

Plaintiff reiterates and re-alleges the allegations contained in paragraphs #1 - 48 and incorporates the same as if fully set forth herein.

49.     By promoting and, in fact, glorifying fighting, the NHL continues to perpetuate its message to players, coaches, and fans that blows to the head should not be considered serious injuries.

50.     The NHL knew that by eliminating staged fights from their game, or at least warning its participants of the risks, they would decrease drug addiction, depression and tragedy.

1659169.1

51.     The NHL knew that in eliminating fighting, or at least warning its participants of the risks, the League would be "sav[ing] the fighters from themselves", but it also knew its bottom line would be negatively affected.

52.     The NHL, in breach of its self-imposed and self-declared duties to (a) keep CARCILLO safe, (b) to advise him of all risks, and (c) to not increase his risk of permanent brain damage and/or addiction, glorified and promoted his NHL fights.

53.     In addition, the NHL breached its duty to disclose to CARCILLO relevant and highly material health information it possessed regarding the significant risks associated with the head traumas endured during NHL fights, including, but not limited to, permanent brain damage.

54.     The NHL's negligence and conscious disregard[9] for CARCILLO's safety, increased the number of concussive and/or sub-concussive blows to the head CARCILLO sustained during his NHL career. Consequently, CARCILLO suffers from significant long-term, degenerative brain damage.

55.     As a proximate result of the NHL's negligence, CARCILLO has suffered personal and pecuniary injuries, including conscious pain and suffering and emotional distress.

---

[9]     Even just recently, the NHL refused to acknowledge that its endorsement of fighting in its game was dangerous. At the time, Commissioner Bettman said of fighting: "Maybe it is [dangerous] and maybe it's not. You don't know that for a fact and it's something we continue to monitor." Bettman said it was premature to draw a connection between fighting in hockey and CTE. He then defended the inclusion of fighting in hockey for profit's sake, saying "[o]ur fans tell us that they like the level of physicality in our game." He further explained "people need to take a deep breath and not overreact."

56.     Recently, the NHL's Commissioner, Gary Bettman, an officer, director and managing agent of the NHL, whose statements are binding on the NHL, made a statement that "no evidence" connects brain trauma sustained during an NHL career and later-in-life neurological impairments, contrary to numerous historical and current scientific studies demonstrating such evidence. This statement tolls any applicable statute of limitations.

WHEREFORE, Plaintiff, CARCILLO, demands judgment against the Defendants, NATIONAL HOCKEY LEAGUE and NATIONAL HOCKEY LEAGUE BOARD OF GOVERNORS, and each of them, in an amount in excess of the minimum amount required for jurisdiction in the United States District Court for the District of Minnesota.

## COUNT II
## BOYNTON V. NHL – LEAGUE INCREASED THE RISK OF BRAIN DAMAGE, ADDICTION AND DEPRESSION.

Plaintiff reiterates and re-alleges the allegations contained in paragraphs #1 - 48 and incorporates the same as if fully set forth herein.

57.     By promoting and, in fact glorifying fighting, the NHL continues to perpetuate its message to players, coaches, and fans that blow to the head should not be considered serious injuries.

58.     The NHL knew that by eliminating staged fights from their game, or at least warning its participants of the risks, they would decrease drug addiction, depression and tragedy.

59. The NHL knew that in eliminating fighting, or at least warning its participants of the risks, the League would be "sav[ing] the fighters from themselves", but it also knew its bottom line would be negatively affected.

60. The NHL, in breach of its self-imposed and self-declared duties to (a) keep BOYNTON safe, (b) to advise him of all risks, and (c) to not increase his risk of permanent brain damage and/or addiction, glorified and promoted his NHL fights.

61. In addition, the NHL breached its duty to disclose to BOYNTON relevant and highly material health information it possessed regarding the significant risks associated with the head traumas endured during NHL fights, including, but not limited to, permanent brain damage.

62. The NHL's negligence and conscious disregard[10] for BOYNTON's safety, increased the number of concussive and/or sub-concussive blows to the head BOYNTON sustained during his NHL career. Consequently, BOYNTON suffers from significant long-term, degenerative brain damage.

63. As a proximate result of the NHL's negligence, BOYNTON has suffered personal and pecuniary injuries, including conscious pain and suffering and emotional distress.

---

[10] Even just recently, the NHL refused to acknowledge that its endorsement of fighting in its game was dangerous. At the time, Commissioner Bettman said of fighting: "Maybe it is [dangerous] and maybe it's not. You don't know that for a fact and it's something we continue to monitor." Bettman said it was premature to draw a connection between fighting in hockey and CTE. He then defended the inclusion of fighting in hockey for profit's sake, saying "[o]ur fans tell us that they like the level of physicality in our game." He further explained "people need to take a deep breath and not overreact."

1659169.1

64.     Recently, the NHL's Commissioner, Gary Bettman, an officer, director and managing agent of the NHL, whose statements are binding on the NHL, made a statement that "no evidence" connects brain trauma sustained during an NHL career and later-in-life neurological impairments, contrary to numerous historical and current scientific studies demonstrating such evidence. This statement tolls any applicable statute of limitations.

WHEREFORE, Plaintiff, BOYNTON, demands judgment against the Defendants, NATIONAL HOCKEY LEAGUE and NATIONAL HOCKEY LEAGUE BOARD OF GOVERNORS, and each of them, in an amount in excess of the minimum amount required for jurisdiction in the United States District Court for the District of Minnesota.

## COUNT III
## CARCILLO V. NHL – LEAGUE FAILED TO WARN OF SIGNIFICANT RISK OF BRAIN DAMAGE

Plaintiff reiterates and re-alleges the allegations contained in paragraphs #1 – 48 and incorporates the same as if fully set forth herein.

65.     Throughout his playing career, the NHL allowed and encouraged CARCILLO to return to playing professional hockey after suffering concussive or sub-concussive brain traumas.

66.     The cumulative effects of CARCILLO's concussive and sub-concussive brain traumas and/or playing through these brain traumas during his NHL playing career caused or exacerbated brain damage.

67.     At all relevant times, the NHL knew, or should have known, that the repetitive brain trauma sustained by CARCILLO during NHL practices and games

substantially increased CARCILLO's risks of developing permanent, later-in-life neurocognitive, neuromuscular and/or neurological deficits and diseases.

68.     The NHL knew, or should have known, that players returning to play before a concussive or sub-concussive head hit had fully healed were at a greater risk of suffering a second concussion and a greater risk of developing later-in-life, long-term brain disease.

69.     At all relevant times, the NHL owed, and reconfirmed, a non-delegable common-law duty of care to its players, including CARCILLO, to properly evaluate, monitor and treat brain trauma caused by concussive and sub-concussive blows sustained in NHL games and/or practices.

70.     The NHL further owed, and reconfirmed, a duty to CARCILLO prior to, during, and after his NHL career to take all reasonable steps to ensure his health and safety and inform him of the risks of long-term, later-in-life neurodegenerative impairments from repetitive brain trauma.

71.     The NHL failed to warn CARCILLO of the risks of suffering long-term brain disease due to repeated hits to the head in NHL games, practices, exhibitions and morning skates.

72.     The NHL failed to warn CARCILLO of the additional dangers of returning to play in NHL games, practices, exhibitions and morning skates after sustaining concussive brain traumas and before such traumas had fully healed.

73.     The NHL was negligent in one or more of the following ways:

a.   Failing to warn CARCILLO of his increased risk of developing later-in-life neurodegenerative disease and neurocognitive impairments;

b.   Failing to warn CARCILLO of the potential long-term impact of suffering numerous concussive head traumas;

c.   Failing to warn CARCILLO of the consequences of playing through the concussions and/or his symptoms;

d.   Failing to ensure rapid, accurate diagnosis of CARCILLO's brain injuries;

e.   Failing to implement effective policies or procedures to prevent CARCILLO from returning to a game or practice in which he sustained a head injury; and

f.   Failing to regulate and monitor practices, games, equipment and medical care so as to minimize the long-term risk associated with repetitive brain injuries suffered by CARCILLO.

74.   As a result of one or more of the foregoing acts and/or omissions by the NHL, CARCILLO suffered significant long-term, degenerative brain damage.

75.   Recently, the NHL's Commissioner, Gary Bettman, an officer, director and managing agent of the NHL, whose statements are binding on the NHL, made a statement that "no evidence" connects brain trauma sustained during an NHL career and later-in-life neurological impairments, contrary to numerous historical and current scientific studies demonstrating such evidence. This statement tolls any applicable statute of limitations.

WHEREFORE, Plaintiff, CARCILLO, demands judgment against the Defendants, NATIONAL HOCKEY LEAGUE and NATIONAL HOCKEY LEAGUE BOARD OF GOVERNORS, and each of them, in an amount in excess of the minimum

amount required for jurisdiction in the United States District Court for the District of Minnesota.

**COUNT IV**
**BOYNTON V. NHL – LEAGUE FAILED TO WARN OF SIGNIFICANT RISK OF BRAIN DAMAGE**

Plaintiff reiterates and re-alleges the allegations contained in paragraphs #1 – 48 and incorporates the same as if fully set forth herein.

76.     Throughout his playing career, the NHL allowed and encouraged BOYNTON to return to playing professional hockey after suffering concussive or sub-concussive brain traumas.

77.     The cumulative effects of BOYNTON's concussive and sub-concussive brain traumas and/or playing through these brain traumas during his NHL playing career caused or exacerbated brain damage.

78.     At all relevant times, the NHL knew, or should have known, that the repetitive brain trauma sustained by BOYNTON during NHL practices and games substantially increased BOYNTON's risks of developing permanent, later-in-life neurocognitive, neuromuscular and/or neurological deficits and diseases.

79.     The NHL knew, or should have known, that players returning to play before a concussive or sub-concussive head hit had fully healed were at a greater risk of suffering a second concussion and a greater risk of developing later-in-life, long-term brain disease.

80.     At all relevant times, the NHL owed, and reconfirmed, a non-delegable common-law duty of care to its players, including BOYNTON, to properly evaluate,

monitor and treat brain trauma caused by concussive and sub-concussive blows sustained in NHL games and/or practices.

81.     The NHL further owed, and reconfirmed, a duty to BOYNTON prior to, during, and after his NHL career to take all reasonable steps to ensure his health and safety and inform him of the risks of long-term, later-in-life neurodegenerative impairments from repetitive brain trauma.

82.     The NHL failed to warn BOYNTON of the risks of suffering long-term brain disease due to repeated hits to the head in NHL games, practices, exhibitions and morning skates.

83.     The NHL failed to warn BOYNTON of the additional dangers of returning to play in NHL games, practices, exhibitions and morning skates after sustaining concussive brain traumas and before such traumas had fully healed.

84.     The NHL was negligent in one or more of the following ways:

    a.      Failing to warn BOYNTON of his increased risk of developing later-in-life neurodegenerative disease and neurocognitive impairments;

    b.      Failing to warn BOYNTON of the potential long-term impact of suffering numerous concussive head traumas;

    c.      Failing to warn BOYNTON of the consequences of playing through the concussions and/or his symptoms;

    d.      Failing to ensure rapid, accurate diagnosis of BOYNTON's brain injuries;

    e.      Failing to implement effective policies or procedures to prevent BOYNTON from returning to a game or practice in which he sustained a head injury; and

      f.    Failing to regulate and monitor practices, games, equipment and medical care so as to minimize the long-term risk associated with repetitive brain injuries suffered by BOYNTON.

85.    As a result of one or more of the foregoing acts and/or omissions by the NHL, BOYNTON suffered significant long-term, degenerative brain damage.

86.    Recently, the NHL's Commissioner, Gary Bettman, an officer, director and managing agent of the NHL, whose statements are binding on the NHL, made a statement that "no evidence" connects brain trauma sustained during an NHL career and later-in-life neurological impairments, contrary to numerous historical and current scientific studies demonstrating such evidence. This statement tolls any applicable statute of limitations.

WHEREFORE, Plaintiff, BOYNTON, demands judgment against the Defendants, NATIONAL HOCKEY LEAGUE and NATIONAL HOCKEY LEAGUE BOARD OF GOVERNORS, and each of them, in an amount in excess of the minimum amount required for jurisdiction in the United States District Court for the District of Minnesota.

## COUNT V
## CARCILLO V. NHL – LEAGUE MISREPRESENTED THE RISK OF BRAIN DAMAGE

Plaintiff reiterates and re-alleges the allegations contained in paragraphs #1 – 48 and incorporates in the same as if fully set forth herein.

87.    At all relevant times, the NHL was in a position of superior knowledge regarding the effects and consequences of concussive and sub-concussive hits to the head inherent in NHL Hockey.

88.     At all relevant times, the NHL knew, or should have known, that the repetitive brain trauma sustained by CARCILLO during NHL practices and games substantially increased CARCILLO's risk of developing permanent, later-in-life neurocognitive, neuromuscular and/or neurological deficits and diseases.

89.     Despite such knowledge, at no time during CARCILLO's NHL career did the NHL warn CARCILLO that the repetitive brain trauma he would sustain, or had sustained, could substantially increase their risk of developing neurocognitive, neuromuscular and/or neurological deficits and diseases.

90.     Instead, the NHL promoted a culture in which players such as CARCILLO were encouraged to return to play despite experiencing signs and symptoms of traumatic brain injury.

91.     In fact, the NHL knowingly concealed from CARCILLO the risks of short-term and long-term cognitive, mental health and neurological deficits and diseases associated with repetitive brain trauma, including, but not limited to, the risks of returning to practice and games too soon after sustaining a traumatic brain injury.

92.     CARCILLO did not know of the link between repeated concussive and sub-concussive blows and long-term, later-in-life neurocognitive impairments. CARCILLO reasonably relied on the NHL's silence concerning the long-term neurocognitive risks of repeated concussive and sub-concussive blows as affirmation that no such risk existed.

93.     In reasonable reliance upon the NHL's denials of any later-in-life risks and/or its silence on the topic, CARCILLO continued to play NHL hockey while

experiencing concussive symptoms in justifiable reliance on the NHL's proclamations that they would not be subjecting themselves to brain damage.

94.     The concealed material, facts and information from CARCILLO with the intent to deceive CARCILLO caused CARCILLO to suffer significant brain damage and/or other neurocognitive or neurological deficits.

WHEREFORE, Plaintiff, CARCILLO, demands judgment against the Defendants, NATIONAL HOCKEY LEAGUE and NATIONAL HOCKEY LEAGUE BOARD OF GOVERNORS, and each of them, in an amount in excess of the minimum amount required for jurisdiction in the United States District Court for the District of Minnesota.

<u>COUNT VI</u>
<u>BOYNTON V. NHL – LEAGUE MISREPRESENTED THE RISK OF BRAIN DAMAGE</u>

Plaintiff reiterates and re-alleges the allegations contained in paragraphs #1 – 48 and incorporates the same as if fully set forth herein.

95.     At all relevant times, the NHL was in a position of superior knowledge regarding the effects and consequences of concussive and sub-concussive hits to the head inherent in NHL Hockey.

96.     At all relevant times, the NHL knew, or should have known, that the repetitive brain trauma sustained by BOYNTON during NHL practices and games substantially increased BOYNTON's risk of developing permanent, later-in-life neurocognitive, neuromuscular and/or neurological deficits and diseases.

97.     Despite such knowledge, at no time during BOYNTON's NHL career did the NHL warn BOYNTON that the repetitive brain trauma he would sustain, or had sustained, could substantially increase their risk of developing neurocognitive, neuromuscular and/or neurological deficits and diseases.

98.     Instead, the NHL promoted a culture in which players such as BOYNTON were encouraged to return to play despite experiencing signs and symptoms of traumatic brain injury.

99.     In fact, the NHL knowingly concealed from BOYNTON the risks of short-term and long-term cognitive, mental health and neurological deficits and diseases associated with repetitive brain trauma, including, but not limited to, the risks of returning to practice and games too soon after sustaining a traumatic brain injury.

100.    BOYNTON did not know of the link between repeated concussive and sub-concussive blows and long-term, later-in-life neurocognitive impairments. BOYNTON reasonably relied on the NHL's silence concerning the long-term neurocognitive risks of repeated concussive and sub-concussive blows as affirmation that no such risk existed.

101.    In reasonable reliance upon the NHL's denials of any later-in-life risks and/or its silence on the topic, BOYNTON continued to play NHL hockey while experiencing concussive symptoms in justifiable reliance on the NHL's proclamations that they would not be subjecting themselves to brain damage.

102.   The concealed material, facts and information from BOYNTON with the intent to deceive BOYNTON caused BOYNTON to suffer significant brain damage and/or other neurocognitive or neurological deficits.

WHEREFORE, Plaintiff, BOYNTON, demands judgment against the Defendants, NATIONAL HOCKEY LEAGUE and NATIONAL HOCKEY LEAGUE BOARD OF GOVERNORS, and each of them, in an amount in excess of the minimum amount required for jurisdiction in the United States District Court for the District of Minnesota.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all issues so triable.


Dated:  June 21, 2018                    s/Christopher J. Haugen
                                         Terrance J. Wagener
                                         Christopher J. Haugen
                                         **MESSERLI | KRAMER**
                                         100 South Fifth Street
                                         1400 Fifth Street Towers
                                         Minneapolis, MN  55402
                                         Telephone:  (612) 672-3600
                                         twagener@messerlikramer.com
                                         chaugen@messerlikramer.com

                                         And

                                         Thomas A. Demetrio, ARDC No. 611506
                                         (Admitted in MDL-2551)
                                         William T. Gibbs, ARDC No. 6282949
                                         (Admitted in MDL-2551)
                                         **CORBOY & DEMETRIO, P.C.**
                                         33 N. Dearborn St., 21st Floor
                                         Chicago, IL 60602
                                         Telephone: (312) 346-3191
                                         tad@corboydemetrio.com
                                         wtg@corboydemetrio.com

1659169.1

And

Richard R. Gordon, ARDC No. 627751
(Admitted in MDL-2551)
**GORDON LAW OFFICES, LTD.**
211 W. Wacker Dr., Suite 500
Chicago, IL 60606
Telephone: (312) 332-5200
rrg@gordonlawchicago.com

**ATTORNEYS FOR PLAINTIFFS**