# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

DANIEL CARCILLO AND NICHOLAS )
BOYNTON )
                                                  )
                Plaintiffs, )        Case No. 19 CV 6156
                                                 )
        v. )
                                                 )        Judge John Robert Blakey
NATIONAL HOCKEY LEAGUE AND )
NATIONAL HOCKEY LEAGUE BOARD )
OF GOVERNORS )
                                                  )
            Defendants. )

## MEMORANDUM OPINION AND ORDER

Plaintiffs Daniel Carcillo and Nicholas Boynton, retired professional hockey players, sue the National Hockey League (NHL) and its Board of Governors, claiming that Defendants have caused them injuries from their years of playing. Specifically, Plaintiffs allege that Defendants promoted fighting in the sport, failed to warn them of the risks of suffering repeated head traumas, and misrepresented and concealed those risks to Plaintiffs' detriment. Defendants have moved for judgment on the pleadings, arguing that Section 301 of the Labor Management Relations Act completely preempts Plaintiffs' state-law claims. [48]. For the reasons explained below, this Court finds that Section 301 preempts certain portions of Plaintiffs' claims and dismisses those claims without prejudice as premature. This Court also declines to exercise supplemental jurisdiction over the remaining portions of Plaintiffs' state-law claims.

## I.     Background

### A.     The Complaint's Allegations

#### 1.     The Parties

Defendant NHL operates a professional ice hockey league comprising 31 franchised member clubs.  [1] at ¶ 1.  Defendant NHL Board of Governors serves as the NHL's governing body and establishes its policies.  *Id.* at ¶ 2.

Plaintiff Daniel Carcillo is a former professional hockey player who played a total of 429 games in the NHL for the Phoenix Coyotes, Philadelphia Flyers, Los Angeles Kings, New York Rangers, and Chicago Blackhawks.  *Id.* at ¶ 10.  During his NHL career, Carcillo participated in regular season games as well as hundreds of pre-season games, training camp practices, pre-season and post-season practices, and morning skates.  *Id.* at ¶ 17.  Carcillo claims that he was involved in 149 hockey fights throughout the course of his NHL career and has suffered multiple serious head traumas.  *Id.* at ¶¶ 12–13.

Like Carcillo, Plaintiff Nicholas Boynton used to play hockey professionally, playing a total of 605 NHL games for the Boston Bruins, Phoenix Coyotes, Florida Panthers, Anaheim Ducks, Chicago Blackhawks, and Philadelphia Flyers.  *Id.* at ¶ 15.  Boynton participated in numerous pre-season games, practices, and morning skates.  *Id.* at ¶ 16.  He claims that he was involved in 51 hockey fights during his NHL career and, like Carcillo, he alleges he has suffered multiple serious head traumas throughout that career.  *Id.* at ¶¶ 17–18.

2

### 2. Allegations of Violence

Plaintiffs claim that, for nearly a century, the NHL has developed and promoted a "culture of gratuitous violence" by permitting and promoting fighting, despite knowing that brain traumas resulting from fighting can lead to permanent brain injury and related symptoms. *Id.* at ¶¶ 30–32, 46.

For instance, in 1975, NHL players proposed the imposition of an automatic suspension for the balance of the game in which a fight occurred. *Id.* at ¶ 35. The NHL rejected that proposal. *Id.* The NHL continued to promote fighting throughout the 1980s and, according to Plaintiff, has referred to that decade as "The Golden Era of Fighting," where the league averaged approximately one fight for every game played. *Id.* at ¶ 37. Plaintiffs allege that the NHL refused to ban fighting, and in the 1990s and 2000s, its prevalence continued; during these decades, the league held "staged fights" nearly every night. *Id.* at ¶ 41.

### B. The Collective Bargaining Agreements

Because Defendants' motion implicates this Court's subject matter jurisdiction, Defendants have submitted extrinsic evidence in the form of an unrebutted declaration by Julie Grand, the NHL's Deputy General Counsel. [50]. Grand states that both Carcillo and Boynton were subject to collective bargaining agreements (CBAs) between the NHL and the National Hockey League Players' Association (NHLPA), the exclusive collective bargaining representative for NHL players. *Id.* at ¶ 2. According to Grand, three separate CBAs were in effect during the dates Plaintiffs played in the NHL: one in effect between January 13, 1995

through September 15, 2004 (the 1995 CBA); another in effect between July 22, 2005 and September 15, 2012 (the 2005 CBA); and the last that has been in effect since September 16, 2012 (the 2012 CBA). *Id.*

> **30.2 League Playing Rules.** Each player shall be bound by the League's Playing Rules to the extent that such rules are not in conflict with provisions of this Agreement. . . .

> **30.3 Amendments.** The NHL and its Clubs shall not, during the term of this Agreement or any extension thereof, amend or modify the provisions (or portions thereof) of the League Rules or any of the League's Playing Rules in existence on the date of this Agreement which affect terms or conditions of employment of any Player, without the prior written consent of the NHLPA which shall not be unreasonably withheld.

[50-1] at 101; [50-2] at 146; [50-3] at 191.

Additionally, each CBA contains provisions directed at player injuries. The 2005 and 2012 CBAs state that any "determination that a Player is eligible to be placed on the Injured Reserve List, or designated as Injured Non-Roster, shall be made by the Club's physician in accordance with the Club's medical standards and documented." [50-2] at 105; [50-3] at 125. The 1995 CBA similarly stated that all "determinations that a player has suffered a major injury must be made by the Club's medical staff in accordance with the Club's medical standards." [50-1] at 78. All three CBAs expressly delegated the responsibility for making "fitness-to-play" determinations to each club's physicians. *Id.* at 105; [50-2] at 265–66; [50-3] at 333–34.

Both the 2005 and 2012 CBAs also provide each player with the right to obtain a second medical opinion in the event he disagreed with a club physician's opinion as

to his fitness to play.  [50-2] at 109; [50-3] at 132.  The 1995 CBA further provides for a review of a player's fitness to play by an independent medical specialist if he disagrees with the club physician's determination.  [50-1] at 105.  The 2005 and 2012 CBAs also require that each club conduct an annual exit physical at the end of each NHL season, document "all injuries that may require future medical or dental treatment either in the near future or post-career," and provide each player with a complete copy of his medical records following each season.  [50-2] at 129; [50-3] at 174.

### D.     The Parties' Pleadings and Procedural History

Plaintiffs bring three sets of state-law claims.  In Counts I and II, Plaintiffs allege that Defendants' "negligence and conscious disregard" for their safety increased the number of concussive and/or sub-concussive blows they sustained during their NHL careers, causing significant long-term degenerative brain damage. *Id.* at ¶¶ 49–64.

Counts III and IV assert "failure to warn" claims, alleging that Defendants breached their common law duties to: inform them of the increased risk of developing long-term brain disease and neurocognitive impairments; ensure the rapid and accurate diagnoses of their brain injuries; implement policies or procedures designed to prevent Plaintiffs from returning to a game or practice after sustaining a head injury; and regulate and monitor practices, games, equipment, and medical care to minimize the long-term damage Plaintiffs ultimately sustained.  *Id.* at ¶¶ 65–86.

Finally, Counts V and VI allege that Defendants deliberately concealed and misrepresented material facts and information from Plaintiffs regarding the risks of developing brain damage from fighting. *Id.* at ¶¶ 87–102.

Defendants answered the complaint, denying all allegations and asserting a number of affirmative defenses, including that federal law preempts Plaintiff's claims due to "applicable collective bargaining agreements governing the terms and conditions" of their employment as NHL players. [14] at Third Defense.

Plaintiffs initially filed suit in June 2018 in the U.S. District Court for the District of Minnesota as part of multidistrict litigation proceedings (MDL) under the caption *In re Nat'l Hockey Players' Concussion Injury Litig.*, MDL Case No. 0:14-md-2551-SRN-BRT. [1]; [43] at 2. About a year later, the parties jointly moved to transfer venue. [17]. The Minnesota district court granted that motion in September 2019, and thereafter transferred the case to this Court. *Id.*

Defendants have now moved to dismiss the complaint on the basis that Section 301 of the Labor Management Relations Act (LMRA) completely preempts Plaintiffs' state-law claims and, alternatively, that Plaintiffs fail to state plausible claims. [49]. Plaintiffs oppose the motion. [54].

## II.  Legal Standard

Defendants have moved for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). A complaint that fails to state a claim to relief "that is plausible on its face" will not survive. *Denan v. Trans Union LLC*, 959 F.3d 290, 293 (7th Cir. 2020). This Court must take the well-pleaded allegations of the complaint

as true and draw all reasonable inferences in Plaintiffs' favor. *See Bishop v. Air Line Pilots Ass'n, Int'l*, 900 F.3d 388, 400 (7th Cir. 2018).

As a threshold issue, however, this Court must determine whether it can exercise subject matter jurisdiction over this case because Plaintiffs bring only state-law claims and the complaint lacks any jurisdictional allegations. *Restoration Risk Retention Grp., Inc. v. Gutierrez*, 880 F.3d 339, 345 (7th Cir. 2018) (instructing that federal courts have an independent obligation to ensure subject matter jurisdiction).

Clearly, this Court possesses no basis for diversity jurisdiction. According to the complaint, Defendant NHL is an unincorporated association of professional hockey teams with teams in many states, including Illinois, and Plaintiff Carcillo is an Illinois citizen. [1] at ¶¶ 9, 19. Because the citizenship of an unincorporated association depends upon the citizenship of its individual members, *Americold Realty Tr. v. Conagra Foods, Inc.*, 136 S. Ct. 1012, 1015 (2016), and one of its members shares state citizenship with a Plaintiff, this matter lacks complete diversity, *see Altom Transp., Inc. v. Westchester Fire Ins. Co.*, 823 F.3d 416, 420 (7th Cir. 2016) (noting that 28 U.S.C. § 1332 requires complete diversity, meaning that "no plaintiff may be a citizen of the same state as any defendant"); *see also, e.g.*, *Nelson v. Nat'l Hockey League*, 20 F. Supp. 3d 650, 652 n.1 (N.D. Ill. 2014) (noting that the court could not exercise diversity jurisdiction in a case between the plaintiff, a Minnesota citizen, and the defendant, the NHL, because one of the NHL's members is a Minnesota team).

Likewise, the face of the complaint fails to raise a federal question because Plaintiffs plead only state-law claims and, generally, under the well-pleaded complaint rule, "federal jurisdiction exists only when a federal question is presented on the face of the plaintiff's properly pleaded complaint." *Caterpillar Inc. v. Williams,* 482 U.S. 386, 392 (1987). The Supreme Court recognizes, however, an "independent corollary" to the general rule that confers federal jurisdiction where a federal law completely preempts an area of state law. *Id.* at 393. When complete preemption occurs, as it can in the context of the LMRA, "any claim purportedly based on that pre-empted state law is considered, from its inception, a federal claim, and therefore arises under federal law." *Crosby v. Cooper B-Line, Inc.*, 725 F.3d 795, 800 (7th Cir. 2013) (quoting *Caterpillar*, 482 U.S. at 393); *see also Boogaard v. Nat'l Hockey League*, 891 F.3d 289, 293 (7th Cir. 2018).

Here, Defendants argue that the LMRA completely preempts all of Plaintiffs' claims, thus supplying this Court with both the basis for federal jurisdiction and a basis to dismiss the claims. [48] at 2. Because Defendants have raised jurisdictional arguments, this Court construes Defendants' Rule 12(c) motion as one also brought under Rule 12(b)(1) for lack of subject matter jurisdiction. *See Fernandez v. Kerry, Inc.*, No. 17-CV-08971, 2020 WL 7027587, at *2 (N.D. Ill. Nov. 30, 2020) (noting that courts in this district consider motions arguing complete preemption under the LMRA as motions to dismiss brought under Rule 12(b)(1) for lack of subject matter jurisdiction).

Under Rule 12(b)(1), this Court must construe Plaintiffs' complaint in the light most favorable to Plaintiffs, accept as true all well-pleaded facts, and draw reasonable inferences in his favor. *Silha v. ACT, Inc.*, 807 F.3d 169, 173 (7th Cir. 2015); *Long v. Shorebank Dev. Corp.*, 182 F.3d 548, 554 (7th Cir. 1999). Courts evaluating Rule 12(b)(1) motions may look beyond the complaint to consider whatever evidence has been submitted on the issue to determine whether subject matter jurisdiction exists. *Silha*, 807 F.3d at 173 (noting that a court "may look beyond the pleadings and view any evidence submitted" when reviewing a challenge that there is *in fact* no subject matter jurisdiction, even if the pleadings are formally sufficient).

## III. Analysis

Defendants have moved to dismiss the complaint in its entirety based upon preemption and for failure to state a claim. [48]; [49]. Plaintiffs oppose the motion, arguing that preemption is inapplicable here and that they have stated valid claims in this forum. [54].

As discussed, this Court must determine whether the LMRA completely preempts Plaintiffs' state-law claims, providing this Court with a basis to exercise subject matter jurisdiction. *See Crosby*, 725 F.3d at 799, 803 (observing in a case involving state-law claims with non-diverse parties that, "[w]ithout Section 301 'complete preemption,' there is no basis for federal subject-matter jurisdiction over this case").

9

### A. Preemption

#### 1. Section 301

Section 301 of the LMRA "provides a federal rule for contract disputes between employers and labor organizations or between different labor organizations." *Crosby*, 725 F.3d at 800 (citing 29 U.S.C. § 185(a)). Section 301 has complete preemptive force, *Atchley v. Heritage Cable Vision Assocs.*, 101 F.3d 495, 498 (7th Cir. 1996), governing claims founded "directly on rights created by collective-bargaining agreements," as well as claims "substantially dependent on analysis of a collective-bargaining agreement," *Caterpillar*, 482 U.S. at 394 (internal quotation marks omitted).

Assessing complete preemption under Section 301 requires this Court to look beyond the face of the complaint and "evaluate the *substance* of plaintiff's claims." *Crosby*, 725 F.3d at 800 (quoting *Paul v. Kaiser Found. Health Plan of Ohio,* 701 F.3d 514, 519 (6th Cir. 2012)). Although Section 301 broadly preempts many state-law theories, it does not extend to every state law that "may have some connection to a CBA." *Id.* The key inquiry is whether a state-law claim is "inextricably intertwined with consideration of the terms of the labor contract." *Id.* (quoting *Allis–Chalmers Corp. v. Lueck,* 471 U.S. 202, 213 (1985)).

#### 2. Choice of Law

Before determining whether Section 301 preempts Plaintiff's state-law claims, this Court must decide which state's laws applies in the absence of preemption. *Sluder v. United Mine Workers of Am., Int'l Union*, 892 F.2d 549, 553 (7th Cir. 1989).

Ordinarily, when a case has been transferred from another district, this Court applies the choice-of-law rules of the state in which the transferor court sits—in this case, Minnesota. *Dobbs v. DePuy Orthopedics, Inc.*, 842 F.3d 1045, 1048 (7th Cir. 2016). But as an exception to that general rule, "foreign cases filed directly in a district court as a part of ongoing multidistrict litigation are treated as having originated outside of that district." *Id.* at 1049. And here, the parties jointly moved to transfer venue from the MDL in Minnesota to this district, which supports treating this district as the originating venue. *See id.* at 1048–49 (holding that the Northern District of Illinois constituted the proper venue where the parties would have filed the case here absent participation in multidistrict litigation in Ohio). This Court thus applies the choice of law rules of Illinois. *Id.*[1]

Illinois follows the Restatement (Second) of Conflict of Laws, which directs this Court to consider which state has the most significant contacts to each claim. *Cont'l Vineyard, LLC v. Vinifera Wine Co., LLC*, 973 F.3d 747, 758 (7th Cir. 2020); *Dobbs*, 842 F.3d at 1049. Under this test, the law of the place of injury controls unless Illinois has a more significant relationship with the occurrence and with the parties. *Townsend v. Sears, Roebuck & Co.*, 879 N.E.2d 893, 902–04 (Ill. 2007); *see Abad v. Bayer Corp.*, 563 F.3d 663, 670 (7th Cir. 2009) (noting the "place where the injury"

---

[1] Plaintiffs assert that Illinois choice of law rules apply, [54] at 16, while Defendants assert that either Minnesota or Illinois choice of law rules apply, [49] at 21. In positing that Minnesota choice of law rules might apply, Defendants rely upon the general rule that transferee courts apply the choice of law rules of the transferor forum, but ignore the exception that applies to cases transferred from MDL proceedings, as discussed above, *see Dobbs*, 842 F.3d at 1049. Regardless, Defendants concede that it does not matter which state's choice of law rules apply (as between Illinois and Minnesota) because the outcome of a choice of law analysis is the same under either state's rules. [49] at 21.

occurred constitutes the "presumptive source of the law governing the accident" under the "most significant relationship" test).

Here, Defendants argue that those states are Pennsylvania, where Carcillo played the most games, and Massachusetts, where Boynton played the majority of his games. [49] at 21. This Court agrees. Another district court has used—and the Seventh Circuit has affirmed its use of—this approach, determining, in a personal injury action against the NHL, that an NHL player's "place of injury" is the state where he spent the majority of his professional career. *See Boogaard v. Nat'l Hockey League*, 255 F. Supp. 3d 753, 759 (N.D. Ill. 2017) (applying Minnesota law to deceased NHL player's claims against the NHL, reasoning that the state was the place of his death and "where he spent the bulk of his NHL career"), *aff'd*, 891 F.3d 289 (7th Cir. 2018). This Court will therefore apply Pennsylvania and Massachusetts law to Plaintiffs' respective claims.

### 3. Preemption Analysis

This Court now moves on to the merits of Defendants' preemption arguments. As discussed above, to determine preemption, this Court asks whether a state-law claim is "inextricably intertwined with consideration of the terms of the labor contract," *Crosby*, 725 F.3d at 800, which occurs where an element of the claim "requires a court to interpret any term of" the collective bargaining agreement, *Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 407 (1988). This Court addresses each group of claims separately.[2]

---

[2] Initially, Plaintiffs suggest that the LMRA cannot preempt their claims because they were retirees at the time their claims accrued. [54] at 8–9. This argument is meritless. The preemption analysis

### a.     Counts I and II

Plaintiffs title Counts I and II as "League increased the risk of brain damage, addition, and depression." [1] at Counts I, II.  Because both counts assert injuries stemming from "the proximate result of the NHL's negligence," this Court construes them as negligence claims.  *Id.* at ¶¶ 55, 63.  To prevail on their negligence claims under both Massachusetts and Pennsylvania law, Plaintiffs must prove: (1) Defendants owed them a duty of reasonable care; (2) Defendants breached this duty; and (3) the breach caused damage to Plaintiffs.  *Nguyen v. Mass. Inst. of Tech.*, 96 N.E.3d 128, 139 (Mass. 2018); *Brewington ex rel. Brewington v. City of Philadelphia*, 199 A.3d 348, 355 (Pa. 2018).

The allegations within these counts appear to assert three different theories of relief, so this Court assesses each theory separately for the purposes of preemption.

This Court begins with Plaintiffs' allegations that Defendants injured them by "promoting and . . . glorifying fighting."  *Id.* at ¶¶ 49, 57.  This Court need not interpret the CBAs to decide the merits of this theory that Defendants promoted fighting.  In two other cases brought by hockey players against the NHL, the district courts concluded that the LMRA did not preempt similar state-law negligence claims premised upon the active glorification and promotion of violence, reasoning that a duty to refrain from unreasonable harm remains rooted in common law and does not

---

does not rest upon whether a plaintiff was a member of the bargaining unit at the time his claim accrued, but instead upon whether the resolution of his claim requires interpretation of a labor contract.  Numerous courts have considered and applied complete preemption to retirees' claims.  *See Montador v. Nat'l Hockey League*, No. 15 C 10989, slip op. at 10–11 (N.D. Ill. Nov. 24, 2020); *Duerson v. Nat'l Football League, Inc.*, No. 12 C 2513, 2012 WL 1658353, at *1 (N.D. Ill. May 11, 2012).

require interpreting a CBA. *See Boogaard v. Nat'l Hockey League*, 211 F. Supp. 3d 1107, 1112 (N.D. Ill. 2016) ("That theory of tort—that the NHL unreasonably harmed Boogaard—is viable under Illinois and Minnesota law and not preempted by the LMRA."); *Montador v. Nat'l Hockey League*, No. 15 C 10989, slip op. at 13 (N.D. Ill. Nov. 24, 2020) (holding that the LMRA did not preempt an Illinois claim based upon a duty "to not unreasonably promote violence").

As in those cases, Plaintiffs' theory rests upon a common law duty to refrain from unreasonably harming others, and this Court need not interpret the CBAs to resolve liability. Under both Pennsylvania and Massachusetts law, in circumstances "involving an actor's affirmative conduct, he is generally 'under a duty to others to exercise the care of a reasonable man to protect them against an unreasonable risk of harm to them arising out of the act.'" *Dittman v. UPMC*, 196 A.3d 1036, 1046 (Pa. 2018) (quoting *Seebold v. Prison Health Servs., Inc.*, 57 A.3d 1232, 1246 (Pa. 2012)); *see Harbi v. Mass. Inst. of Tech.*, No. CV 16-12394-FDS, 2017 WL 3841483, at *8 (D. Mass. Sept. 1, 2017) ("As a general principle of tort law, every actor has a duty to exercise reasonable care to avoid physical harm to others.") (quoting *Litif v. United States*, 682 F. Supp. 2d 60, 75 (D. Mass. 2010), *aff'd*, 670 F.3d 39 (1st Cir. 2012), *aff'd sub nom. Davis v. United States*, 670 F.3d 48 (1st Cir. 2012)). Plaintiffs' claims therefore survive preemption to the extent they are based upon Defendants' alleged breach of common law duties to refrain from unreasonable harm.

The remainder of Counts I and II, however, assert preempted claims. In these counts, Plaintiffs also accuse Defendants of breaching their supposed "*self-imposed*

14

*and self-declared duties*" to keep Plaintiffs safe, to advise them "of all risks," and "to not increase" the risk of "permanent brain damage and/or addiction." [1] at ¶¶ 52, 60 (emphasis added). This theory—that Defendants breached certain duties that they voluntarily assumed—runs headlong into preemption. The Seventh Circuit's opinion in *Sluder v. United Mine Workers of America, International Union* is instructive on this point. In that case, the plaintiff, a coal miner, sued his union after a mine collapsed and paralyzed him. 892 F.2d at 551. The plaintiff alleged that the union undertook certain duties to perform inspections of the mine wall and that its negligence—in performing such inspections and failing to close the mine in dangerous conditions—resulted in the plaintiff's injuries. *Id.* at 551, 554. The Seventh Circuit observed that Illinois law recognizes that a negligence action based upon a defendant's breach of its voluntary undertakings is fact-specific, in that "to define the scope of the duty assumed by the union, it would be necessary to establish the precise responsibility assumed by the union." *Id.* at 554. In that case, the Seventh Circuit explained, the duties to inspect the mine and close it when it presented dangerous conditions did not arise from common law, "but, if at all, by the collective bargaining agreement." *Id.* Accordingly, the court explained, it "would not be possible to define . . . the scope of the union's duty without reference to the collective bargaining agreement that governs the relationship between the company and the union," and thus, the LMRA preempted the plaintiff's negligence claim. *Id.*

Like Illinois law, both Massachusetts and Pennsylvania law provide that a defendant may be liable for harm caused by negligently performing a duty it

voluntarily assumed. *Charney v. Reitz*, No. 1573 MDA 2017, 2018 WL 1886316, at *2 (Pa. Super. Ct. Apr. 20, 2018) (citing *Feld v. Merriam*, 485 A.2d 742, 746 (Pa. 1984)); *Evans v. Lorillard Tobacco Co.*, 990 N.E.2d 997, 1026 (Mass. 2013). And like Illinois law (which the Seventh Circuit applied in *Sluder*), courts applying Pennsylvania and Massachusetts law measure the scope of a defendant's duty by the scope of its undertaking. *Robinson ex rel. Robinson v. Wolters Kluwer Health, Inc.*, No. CIV.A. 11-5702, 2011 WL 6009980, at *6 (E.D. Pa. Dec. 2, 2011); *Evans*, 990 N.E.2d at 1026. As in *Sluder*, this Court finds it impossible to define the scope of Defendants' alleged "self-imposed and self-declared" duties "without reference to the collective bargaining agreement that governs the relationship" between the parties. 892 F.2d at 554; *see also Montador*, slip op. at 9 (holding that the LMRA preempted negligence claims against the NHL based upon allegations that the NHL breached certain duties it voluntarily assumed, because the court could not adjudicate those claims without interpreting the CBA, which included certain provisions "related to return-to-play and end-of-season medical evaluations"). Therefore, the LMRA completely preempts Counts I and II to the extent Plaintiffs base these counts upon the theory that Defendants breached certain duties they voluntarily undertook.

Finally, in these counts, Plaintiffs also allege that Defendants breached their "duty to disclose . . . relevant and highly material health information it possessed regarding the significant risks associated with the head traumas endured during NHL fights, including, but not limited to, permanent brain damage." [1] at ¶¶ 53, 61. This theory that Defendants failed to disclose information to Plaintiffs also runs into

preemption, because such a duty to disclose arises only from fiduciary or contractual obligations. *Duquesne Light Co. v. Westinghouse Elec. Corp.*, 66 F.3d 604, 612 (3d Cir. 1995) ("Pennsylvania courts analyzing whether there was a duty to speak rely almost exclusively on the nature of the contract between the parties and the scope of one party's reliance on the other's representations."); *Marcum v. Columbia Gas Transmission, LLC*, 423 F. Supp. 3d 115, 122 (E.D. Pa. 2019) (noting that the duty to speak arises in limited circumstances under Pennsylvania law, such as a special relationship giving rise to a fiduciary duty); *Garick v. Mercedes-Benz USA, LLC*, No. 17-CV-12042-IT, 2019 WL 3815178, at *3 (D. Mass. Mar. 29, 2019) (noting that under Massachusetts law, "a duty to disclose may arise from a fiduciary or contractual obligation"), *aff'd*, 790 F. App'x 230 (1st Cir. 2020); *Adley v. Burns*, No. CV 16-12265-WGY, 2018 WL 2215512, at *5 (D. Mass. May 15, 2018) (observing that the duty to disclose "may arise if there is a 'fiduciary or other similar relation of trust and confidence between [the parties]'") (quoting *Rood v. Newberg*, 718 N.E.2d 886, 893 (Mass. App. Ct. 1999)).

Here, Plaintiffs do not allege a fiduciary relationship between themselves and Defendants. Thus, any duty to disclose, to the extent applicable at all, would only arise by virtue of contractual obligations Defendants assumed through the CBAs. Because this Court could not determine the scope and merit of Defendants' alleged duty to disclose without consulting the CBAs, the LMRA also preempts Counts I and II to the extent premised upon an alleged breach of a duty to disclose.

17

###### b.     Counts III and IV:  Negligent Failure to Warn

Next, in Counts III and IV, Plaintiffs allege that Defendants knew or should have known that playing through brain traumas resulted in brain damage, and that Defendants negligently failed to warn them of this risk.  [1] at ¶¶ 64–86.  Plaintiffs insist that this Court can adjudicate these failure to warn claims without interpreting the CBAs.  [54] at 6–7, 12.  Not so.

Starting with Carcillo's failure to warn claim, under Pennsylvania law, one does not have a duty to warn another "without a contractual agreement to do so or 'special relationship' among the parties."  *Smith v. Nat'l R.R. Passenger Corp. (Amtrak)*, 25 F. Supp. 2d 578, 579 (E.D. Pa. 1998).  A "special relationship" in this context refers to a confidential or fiduciary relationship.  *Id.*  Carcillo does not claim that a confidential or fiduciary relationship exists between himself and Defendants.  Thus, to the extent Defendants owed him any duty to warn, that duty would arise only under a contractual agreement—the CBAs.  Because this Court would need to consult the CBAs to determine the scope of that duty, Section 301 of the LMRA preempts Carcillo's failure to warn claim in Count III.

Boynton's failure to warn claim meets the same fate.  Under Massachusetts law, "there is no general duty to warn a person of danger"; rather, "such a duty arises when a person or entity has some reason to suppose a warning is needed."  *Fed. Ins. Co. v. Bos. Water & Sewer Comm'n*, 514 F. Supp. 2d 130, 134 (D. Mass. 2007) (citing *De Martin v. N.Y., New Haven & Hartford R.R. Co.,* 143 N.E.2d 542, 545 (Mass. 1957)).  That duty arises in certain limited contexts, such as where there is a

landowner-invitee relationship, *Miller v. Fickett*, 724 N.E.2d 354, 355 (Mass. App. Ct. 2000), *aff'd*, 738 N.E.2d 352 (2000), or in the products liability field, where that duty runs from a manufacturer to a consumer, *Taupier v. Davol, Inc.*, No. 3:19-CV-10184-KAR, 2020 WL 5665565, at *11 (D. Mass. Sept. 23, 2020). But the parties have presented no legal authority to impose such a common law "duty to warn" based upon the facts alleged here. As such, to the extent Defendants owed Boynton any duty to warn, that duty would arise only by virtue of the terms of the CBAs, not from common law. Consequently, the LMRA completely preempts Boynton's failure to warn claim in Count IV.

### c. Counts V and VI: Misrepresentation

Plaintiffs title the final set of claims in Counts VI and VI as "League misrepresented the risk of brain damage." The complaint fails to specify the type of misrepresentation theory upon which Plaintiffs rely—intentional misrepresentation based upon affirmative statements, intentional misrepresentation based upon omissions, or negligent misrepresentation—but the allegations appear to advance two of these theories.

Under both Massachusetts and Pennsylvania law, an intentional misrepresentation claim based upon affirmative statements requires a plaintiff to establish: (1) that Defendants made a false representation of material fact; (2) for the purpose of inducing the plaintiff to act on this omission; and (3) that the plaintiff then reasonably relied upon the representation; (4) to his detriment. *Carroll v. Guardant Health, Inc.*, No. CV 20-3183, 2021 WL 37718, at *28 (E.D. Pa. Jan. 5, 2021);

*Khelfaoui v. Lowell Sch. Comm.*, No. 19-CV-11861-DLC, 2020 WL 6162945, at *3 (D. Mass. Oct. 21, 2020). A claim for intentional misrepresentation under an omission theory requires a plaintiff to establish the same elements, except that instead of a false representation, the plaintiff must show a material omission of a material fact. *AcBel Polytech, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 928 F.3d 110, 122 (1st Cir. 2019) (applying Massachusetts law); *Bucci v. Wachovia Bank, N.A.*, 591 F. Supp. 2d 773, 783 (E.D. Pa. 2008). And, in contrast to an intentional representation claim, a negligent misrepresentation claim does not require proof that Defendants intended to deceive Plaintiff. *AcBel*, 928 F.3d at 122; *Chaborek v. Allstate Fin. Servs., LLC*, 254 F. Supp. 3d 748, 752 (E.D. Pa. 2017).

In Counts IV and V, Plaintiffs first allege that Defendants "knowingly concealed" from them the risks of brain damage; that Plaintiffs relied upon Defendants' silence or denials of risk; that Defendants intended to deceive them; and that Defendants' knowing concealment of the effects of fighting caused their injuries. [1] at ¶¶ 91, 93–94, 99, 101–02. Plaintiffs characterize this claim as one for negligent misrepresentation, *see* [54] at 20–23, even though their allegations of "knowing" concealment with an intent to deceive present an intentional misrepresentation by omission theory. In any event, whether labeled as intentional misrepresentation by omission or negligent misrepresentation, the LRMA completely preempts this theory.

Under both Massachusetts and Pennsylvania law, Plaintiffs must prove that Defendants possessed a duty to disclose in order to succeed on claims for negligent misrepresentation or intentional misrepresentation under an omission theory. *Bucci*,

591 F. Supp. 2d at 784 (noting that the plaintiff must show a duty to disclose to prevail under both fraud-by-omission and negligent misrepresentation claims in Pennsylvania); *JSB Indus., Inc. v. Nexus Payroll Servs., Inc.*, 463 F. Supp. 2d 103, 107 (D. Mass. 2006) ("Unless there is a duty to disclose, the failure to disclose information is not actionable."). As discussed above, this duty does not typically arise absent a fiduciary or contractual relationship, and Plaintiff has not alleged a fiduciary relationship here. Thus, to the extent Defendants had a duty to disclose information, that duty would ostensibly arise from the CBAs. Because the analysis regarding the existence and scope of that duty would require this Court to interpret the CBAs, the LMRA preempts Plaintiff's theories of intentional misrepresentation by omission and negligent misrepresentation.

Yet the LMRA does not completely preempt Counts V and VI in their entirety. In these counts, Plaintiffs also allege that they relied to their detriment upon the "NHL's denials of any later-in-life risks" and "proclamations that they would not be subjecting themselves to brain damage." [1] at ¶¶ 93, 101. As two other district courts recognized in the context of negligence claims against the NHL, the LMRA does not preempt a tort theory based upon the notion that the NHL "actively and unreasonably harmed [the players] by implicitly communicating that head trauma is not dangerous." *Boogaard*, 211 F. Supp. 3d at 1112; *Montador*, slip op. at 12–13. This theory arises from a duty to refrain from making affirmative misrepresentations, and Massachusetts and Pennsylvania both recognize that common law duty. *Smith v. Zipcar, Inc.*, 125 F. Supp. 3d 340, 344 (D. Mass. 2015); *Bortz v. Noon*, 729 A.2d 555,

561 (Pa. 1999). Thus, as in *Boogaard* and *Montador*, Counts V and VI survive to the extent Plaintiff maintains a theory that Defendants injured them through making active, intentional misrepresentations.

### B. This Court's Jurisdiction

This Court must now decide how Plaintiffs' claims should proceed. As discussed above, Section 301 of the LMRA completely preempts the following claims: Counts I and II, to the extent based upon allegations that Defendant breached certain duties it voluntarily undertook and that it failed to disclose certain information; Counts III and IV in their entirety; and Counts V and VI to the extent based upon an intentional misrepresentation by omission or negligent misrepresentation theory. Because the LMRA completely preempts these claims, this Court considers them Section 301 claims from their inception. *See Crosby*, 725 F.3d at 800; *see also Healy v. Metro. Pier & Exposition Auth.*, 804 F.3d 836, 840 (7th Cir. 2015) ("§ 301 preempts the state law tortious interference claim and converts it into a § 301 claim."). The existence of those Section 301 claims establishes this Court's subject matter jurisdiction.

But unfortunately for Plaintiffs, their Section 301 claims also fail at the outset. Article 17 of the CBAs provides that all disputes "involving the interpretation or application of, or compliance with, any provision of" the CBA be resolved through a grievance procedure and arbitration. [50-1] at 79–80; [50-2] at 108–09; [50-3] at 130–31. Under these circumstances, where the labor contract requires mandatory arbitration, a plaintiff seeking redress under that contract can only bring a so-called

22

"hybrid" Section 301 claim after the grievance process has failed. *Olson v. Bemis Co.*, 800 F.3d 296, 303 (7th Cir. 2015); *see Boogaard v. Nat'l Hockey League*, 126 F. Supp. 3d 1010, 1026 (N.D. Ill. 2015) (noting that because Article 17 of the CBAs required arbitration, the plaintiff's federal claims "can survive only as hybrid claims"). A "hybrid" Section 301 claim is one in which a plaintiff alleges both that his union breached its duty of fair representation and that his employer breached the relevant labor contract. *Rupcich v. United Food & Commercial Workers Int'l Union*, 833 F.3d 847, 853 (7th Cir. 2016). The two claims remain interdependent upon each other, so if "one claim fails, 'neither claim is viable.'" *Id.* (quoting *Crider v. Spectrulite Consortium, Inc.*, 130 F.3d 1238, 1241 (7th Cir. 1997)).

Here, Plaintiffs' hybrid claim is premature because they have not alleged that they exhausted their contractual remedies by utilizing the grievance and arbitration procedure set forth in the CBAs; thus, they currently cannot maintain a claim against the union for breach of its duty of fair representation. *See Bell v. DaimlerChrysler Corp.*, 547 F.3d 796, 804 (7th Cir. 2008) ("A claim that a union has breached its duty to fairly represent one of its members presumes that the union has been given a complete opportunity to pursue that member's grievance."); *see also Boogaard*, 126 F. Supp. 3d at 1027 (holding that the plaintiff's completely preempted claims could not survive as hybrid claims because "[t]here is no indication in the record that the [union] pursued a grievance related to these claims"); *Montador*, slip op. at 11 (noting that "because [the plaintiff] does not assert that he has grieved or arbitrated these preempted claims as required by the CBAs, any claim under section 301 claim is

premature"). This Court therefore dismisses Plaintiffs' federal claims without prejudice.

Finally, the Seventh Circuit has instructed that "the general rule is that, when all federal claims are dismissed before trial, the district court should relinquish jurisdiction over pendent state-law claims rather than resolving them on the merits." *Wright v. Associated Ins. Cos. Inc.*, 29 F.3d 1244, 1251 (7th Cir. 1994). As this Court has dismissed the Section 301 claims, this Court declines to exercise supplemental jurisdiction over the non-preempted state-law claims. *See id.* at 1252; *see also Contreras v. Suncast Corp.*, 237 F.3d 756, 766 (7th Cir. 2001) (noting that the district court's decision to relinquish supplemental jurisdiction is the norm).

## IV. Conclusion

For the reasons explained above, this Court grants Defendants' motion for judgment on the pleadings [48]. Section 301 of the LMRA completely preempts portions of Plaintiffs' state-law claims, and those claims—which automatically convert into federal claims arising under the LMRA—are dismissed without prejudice as premature. Additionally, this Court declines to exercise supplemental jurisdiction over the remaining portions of Plaintiffs' state-law claims. Civil case terminated.

Dated: March 29, 2021

Entered:

John Robert Blakey
United States District Judge

24